**NEIGHBORS OF RANGEVIEW LLC
LIMITED LIABILITY COMPANY AGREEMENT**

**December 29th, 2022**

## TABLE OF CONTENTS

**ARTICLE 1** GENERAL ................................................................................................... 1
   1.1    Membership Agreement ............................................................................ 1
   1.2    Certificate of Limited Liability Company ............................................... 1
   1.3    Name ......................................................................................................... 1
   1.4    Principal Place of Business ...................................................................... 1
   1.5    Names of Members ................................................................................... 2
   1.6    Term of Existence ..................................................................................... 2
   1.7    Subsidiaries ............................................................................................... 2

**ARTICLE 2** DEFINITIONS ........................................................................................... 2

**ARTICLE 3** PURPOSE AND CHARACTER OF THE BUSINESS ............................. 9

**ARTICLE 4** NEW MEMBERS; MEMBERSHIP INTERESTS; CERTIFICATES ..................... 9
   4.1    Admission of New Members ..................................................................... 9
   4.2    No Certificates for Membership Interests ................................................ 10

**ARTICLE 5** PROVISIONS APPLICABLE TO MANAGER ........................................ 10
   5.1    Rights, Powers and Duties of the Manager ............................................. 10
   5.2    Limitations on Powers of Manager .......................................................... 12
   5.3    Conflicts of Interest ................................................................................. 12
   5.4    Reimbursement of Expenses ..................................................................... 15
   5.5    Reserved .................................................................................................... 16
   5.6    Other Activities of Manager ..................................................................... 16
   5.7    Limitation of Liability; Indemnification .................................................. 17
   5.8    Additional Managers ............................................................................... 19
   5.9    Withdrawal ................................................................................................ 19
   5.10   Reserved .................................................................................................... 19
   5.11   Removal of Manager for Cause ................................................................ 19
   5.12   Replacement of a Manager ....................................................................... 22
   5.13   Reserved .................................................................................................... 23
   5.14   Management Fees ...................................................................................... 24

**ARTICLE 6** PROVISIONS APPLICABLE TO MEMBERS ....................................... 24
   6.1    Limited Liability ...................................................................................... 24
   6.2    No Participation in Management .............................................................. 24
   6.3    No Withdrawal or Dissolution ................................................................. 24

**ARTICLE 7** TRANSFERS ............................................................................................. 25
   7.1    Registration, Transfer and Exchange ...................................................... 25
   7.2    Restriction on Transfers ........................................................................... 25
   7.3    Permitted Transferee ................................................................................ 25
   7.4    Transfer by Legal Process ........................................................................ 26
   7.5    Conditions to Permitted Transfers ........................................................... 26

7.6    Resignation ................................................................................................ 27

**ARTICLE 8** BOOKS OF ACCOUNT; REPORTS AND FISCAL MATTERS ........................ 27
8.1    Books of Account; Place; Access. ........................................................... 27
8.2    Financial Information ............................................................................... 28
8.3    Tax Information ........................................................................................ 28
8.4    Tax Elections and Accounting. ................................................................ 28
8.5    Membership Representative. .................................................................... 28
8.6    Required Records ..................................................................................... 30
8.7    Reporting. ................................................................................................. 30

**ARTICLE 9** CAPITAL ................................................................................................. 31
9.1    Initial Capital Contributions ................................................................... 31
9.2    No Right to Return of Contribution ......................................................... 31
9.3    No Additional Capital Contributions ...................................................... 31
9.4    No Interest on Capital .............................................................................. 31
9.5    Reserved. .................................................................................................. 31
9.6    Capital Accounts ..................................................................................... 31

**ARTICLE 10** ALLOCATION OF PROFITS AND LOSSES .............................................. 32
10.1    Capital Account Allocations. ................................................................. 32
10.2    Tax Allocations ..................................................................................... 34
10.3    Tax Credits ............................................................................................ 34
10.4    Code Section 704(c) Allocations .......................................................... 34
10.5    Varying Interests During Fiscal Year .................................................... 34
10.6    Tax Withholding .................................................................................... 34

**ARTICLE 11** DISTRIBUTIONS .................................................................................... 35
11.1    Operating Distributions ......................................................................... 35
11.2    Limitations on Distributions ................................................................. 35

**ARTICLE 12** DISSOLUTION AND LIQUIDATION ........................................................ 36
12.1    Events Causing Dissolution .................................................................. 36
12.2    Liquidation and Winding Up ................................................................. 36
12.3    No Deficit Restoration Obligation ........................................................ 36

**ARTICLE 13** AMENDMENT ....................................................................................... 36

**ARTICLE 14** APPROVAL OF REORGANIZATIONS AND BANKRUPTCY ...................... 37

**ARTICLE 15** REPRESENTATIONS, WARRANTIES OF THE MEMBERS ......................... 37

**ARTICLE 16** MISCELLANEOUS PROVISIONS ............................................................. 39
16.1   Entire Agreement .................................................................................. 39
16.2   No Liability .......................................................................................... 39
16.3   Time of Essence ................................................................................... 39
16.4   Signatures; Counterparts ..................................................................... 39
16.5   Severability .......................................................................................... 39
16.6   Successors and Assigns ........................................................................ 39
16.7   Notices ................................................................................................. 39
16.8   Headings .............................................................................................. 40
16.9   References ............................................................................................ 40
16.10  Construction ........................................................................................ 40
16.11  Governing Law; Dispute Resolution. ................................................... 40
16.12  Third-Party Benefit ............................................................................. 40
16.13  Good Faith and Fair Dealing ............................................................... 41
16.14  Additional Actions and Documents ..................................................... 41
16.15  Specific Performance .......................................................................... 41
16.16  Waiver of Partition .............................................................................. 41

SCHEDULE A ....................................................................................................................

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## NEIGHBORS OF RANGEVIEW LLC

This **LIMITED LIABILITY COMPANY AGREEMENT** (this "*Agreement*") is made by and among TCC Asset Management II LLC, a Delaware limited liability company ("*TCC*" or the "*Manager*"), and Anchorage Investment Partners LLC, a Delaware limited liability company (the "*Investor Member*" and, together with the Manager and any other Members admitted to the Company after the date hereof, collectively, the "*Parties*").

**WHEREAS**, the undersigned have caused the formation of Neighbors of Rangeview LLC, a Delaware limited liability company (the "*Company*").

**WHEREAS**, TCC Portfolio I Acquisition II, a Delaware limited liability company and an Affiliate of the Manager, as Buyer, entered into the PSA (as defined below) to purchase the Property (as defined below).

**NOW**, **THEREFORE**, in consideration of the premises, the mutual covenants and agreements set forth in this Agreement, and other good and valuable consideration, the receipt and adequacy of which the Parties acknowledge, the Parties hereby agree as follows:

## Article 1
## General

1.1    Operating Agreement. The Parties agree that this Agreement constitutes the "operating agreement" of the Company within the meaning of Section 17-101(14) of the Act and that, notwithstanding the date of execution, it shall be effective as of the date of the filing of the Certificate of Formation in the office of the Secretary of State (the "*Effective Date*") and that it shall govern the rights, duties and obligations of the Members, except as otherwise expressly required by the Act.

1.2    Certificate of Formation. The Members and the Manager adopt, approve and ratify the execution and filing in the office of the Secretary of State of the State of Delaware the Certificate of Formation of the Company by the Manager (the "*Certificate of Formation*").

1.3    Name. The name of the Company and the business shall be conducted under the name of Neighbors of Rangeview LLC or under such other name or names as the Investor Member and Manager may unanimously determine. The Manager is authorized to execute and deliver or file such documents and to take such actions as the Investor Member and Manager may unanimously consider advisable to permit the Company to use and to ensure the Company's right to use such name or names.

1.4    Principal Place of Business. The location of the principal place of business of the Company shall be 606 N Saginaw Street, Suite A, Lapeer, Michigan 48446 or such place as the

Investor Member and Manager may unanimously from time-to-time determine (the "*Principal Office*").  The Company may maintain offices and places of business at such other place or places as the Investor Member and Manager may unanimously deem advisable and the Manager is authorized and directed to execute and deliver or file such documents and to take such actions as is necessary to permit the Company to conduct its business in such states.

1.5     Names of Members. The names of the Members and the other Parties and their designation as Manager or Member are as set forth on **Schedule A**, which Schedule will be updated from time to time by the Manager as provided for hereunder.

1.6     Term of Existence. The Company shall be formed as of the time of the filing of the Certificate of Formation in the Office of the Secretary of State of Delaware and its term of existence shall be perpetual, unless earlier terminated, dissolved or liquidated in accordance with the provisions of this Agreement.

1.7     Subsidiaries. Title to certain assets of the Company and operations of the Company may be held by and/or business conducted through, separate Persons that are wholly owned, directly or indirectly, or beneficially, by the Company (each such Person at any level a "*Subsidiary*" and collectively, the "*Subsidiaries*"). The rights, duties, responsibilities and authority of the Members with respect to the assets owned or activities undertaken through a Subsidiary shall be identical to their respective rights, duties, responsibilities and authority with respect to the assets owned or activities undertaken directly by the Company and any provision of this Agreement giving a Member or Manager the right or authority to take any action or refrain from taking any action, or cause the Company to take any action or refrain from taking any action, shall be interpreted to give them the identical right or authority with respect to the appropriate Subsidiary. Any Subsidiary of the Company must be a "disregarded entity" for U.S. federal income tax purposes.

## Article 2
## Definitions

Unless the context otherwise specifies or requires, the terms defined in this Article 2 shall, for the purposes of this Agreement, have the meanings specified in this Article 2. Certain other capitalized terms are defined elsewhere in this Agreement. All defined terms may be used in the singular or the plural, as the context requires.

"*Act*" means the Delaware Revised Uniform Limited Liability Company Act, 6 Del. C. § 17-101, *et seq*., as amended from time-to-time.

"*Adjusted Capital Account Deficit*" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:  (i) increased for any amounts such Member is unconditionally obligated to restore and the amount of such Member's share of Membership Minimum Gain and Member Minimum Gain after taking into account any changes during such year; and (ii) reduced by the items described in Treasury Regulation §§ 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

2

"*Affiliate*" means, when used with reference to a specified Person: (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person; (ii) any Person that is an officer, partner, member or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner, member or trustee, or with respect to which the specified Person serves in a similar capacity; (iii) any Person that, directly or indirectly, is the beneficial owner of ten percent or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person has a substantial beneficial interest; and (iv) any relative or spouse of the specified Person.

"*Agreement*" means this Limited Liability Company Agreement, as it may be amended or supplemented from time-to-time.

"*Available Net Cash Flow*" means all cash receipts of the Company on account of the Property (including the proceeds from any rent or business interruption insurance) other than Net Cash Flow from a Capital Event on hand from time to time plus any amounts released (pursuant to the Operating Budget and Business Plan or as otherwise unanimously agreed by Investor Member and Manager) from reserve less (1) scheduled and required payments of principal and interest payments on indebtedness of the Company; (2) all other cash expenditures, and (3) the reserves necessary for the proper operation of the Company's business as set forth in a duly adopted and approved Operating Budget and Business Plan or as otherwise determined by the Investor Member, acting in its reasonable discretion.

"*Bankruptcy Event*" means, with respect to any Person, (a) if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (b) if one hundred and twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within ninety (90) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated.  For purposes of this Agreement, the foregoing definition of "Bankruptcy" replaces and supersedes the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"*Broker*" has the meaning set forth in Article 15.

"*Business Day*" means any day except a Saturday, Sunday, or other day on which commercial banks in New York City are authorized or required by law to close.

3

"*Capital Account*" has the meaning set forth in <u>Section 9.6</u>.

"*Capital Contribution*" means the amount of money (including, without limitation, all deposit monies funded by the Investor Member under the Deposit Letter) or the fair market value of any property (as agreed by the Members as of the date of contribution) contributed to the Company by any Member.

"*Capital Event*" means (i) any sale or other disposition (directly or indirectly) of all or substantially all of the Property or portion thereof or interest therein, (ii) any loan or other financing obtained by the Company, and any refinancing of indebtedness of the Company or the Property, (iii) any condemnation (or conveyance in lieu thereof) of all or substantially all of the Property or portion thereof; (iv) the receipt by the Company of any insurance recovery relating to the Company or the Property; or (v) an easement sale or other transaction which, in accordance with generally accepted accounting principles in effect from time to time in the United States, as consistently applied, is treated as a capital transaction.

"*Cause*" has the meaning set forth in <u>Section 5.11</u>.

"*Code*" means the Internal Revenue Code of 1986, as amended. Any reference in this Agreement to a Section of the Code shall be considered also to include any subsequent amendment or replacement of that Section.

"Deposit Letter" means that certain letter agreement dated as of November 3, 2022 between TCC Asset Management LLC, an affiliate of the Manager and the Investor Member, relating to the transactions contemplated hereby.

"*Due Care*" means, subject to the limitation on Manager under this Agreement, including without limitation, the Operating Budget, the Business Plan and approval by Investor Member of Major Decisions, to act in good faith and with the care, skill, prudence and diligence (including diligent inquiry) under the circumstances then prevailing that a reasonable manager, under similar obligations and limitations, of real estate and assets such as is owned by the Company would use in the conduct of an enterprise of like character with like aims, it being understood and agreed that any act or omission of Manager arising from an obligation, limitation or delay placed upon Manager under this Agreement, including, without limitation, by the Operating Budget or Business Plan or by the approvals required from Investor Member in connection with Major Decisions shall not constitute a breach by Manager of a standard of Due Care.

"*Effective Date*" has the meaning set forth in <u>Section 1.1</u>.

"*Family Member*" means: (a) an immediate family member of the Member or the Manager (or any holder of a direct or indirect interest therein); (b) any individual who is a descendant of a Member or the Manager (or any holder of a direct or indirect interest therein); (c) any trust or custodianship for the primary benefit of a Member or the Manager (or any holder of a direct or indirect interest therein) or any one or more Family Members previously described.

4

"*Fiscal Year*" means the 12-month accounting period of the Company used for federal income tax purposes ending on December 31 of each year, or such other date as the Investor Member may determine from time-to-time subject to the requirements of Code Section 706; it being understood that the Investor Member may establish other "fiscal years" for financial reporting or any purpose other than federal income tax reporting.

"*Guarantee*" has the meaning set forth in Section 5.13 hereof.

"*Guarantor Losses*" has the meaning set forth in Section 5.13 hereof.

"*Initial Capital Contribution*" means, with respect to each Member, the initial Capital Contributions to the Company by such Member pursuant to **Schedule A**.

"***IRR***" means the applicable percentage rate which, when applied as the discount rate to all distributions made, or deemed to be made, to the Investor Member pursuant to Section 11 would result in an amount which equals the Capital Contributions made, or deemed made, by the Investor Member to the Company in accordance with the terms of this Agreement. For purposes of calculating such internal rate of return: (a) the Initial Capital Contributions shall be deemed made on the date so made; (b) the additional Capital Contribution of the Investor Member, if any, shall be deemed made on the actual date such Capital Contribution is received by the Company; (c) a distribution to the Investor Member shall be deemed made on the actual date such distribution is received by the Investor Member.

"*Key Management Principals*" means Jay Yang and Michael Mirski.

"*Loan*" means the origination of a loan from a lender in order to acquire the Property (or any amendments or restatements thereto or any refinancings or replacements thereof).

"*Loan Agreement*" means the loan agreement governing the terms of the Loan.

"*Loan Documents*" means the Loan Agreement, and any other agreement executed in connection with the Loan.

"*Manager*" means TCC Asset Management II LLC, or any other Person serving as the Manager pursuant to Article 5.

"*Major Decisions*" has the meaning set forth in Section 5.2 hereof.

"*Members*" means the Persons other than Manager executing this Agreement until they cease to be Members and the Persons that are hereafter admitted to the Company as Members in accordance with this Agreement.

"*Membership Interest*" means with respect to any Member, the Membership Interest of such Member as initially set forth on **Schedule A** representing such Member's pro rata share of (i) the Profits and Losses of the Company pursuant to Article 10, and (ii) the right to receive distributions pursuant to Article 11; together with all the other rights and privileges granted to a Member by virtue of being a Member.

#26329v10

"*Net Cash Flow from a Capital Event*" means net cash proceeds received by the Company from or as a result of a Capital Event, after (a) payment of the costs and expenses incurred in connection with any Capital Event in question, (b) payment of debts and liabilities of the Company (and deposits to reserves) solely to the extent required to be paid upon, incurred or established in connection with, the receipt of such proceeds and (c) the establishment or funding of reserves in such amounts and for such purposes as the Investor Member, in its reasonable discretion, determine is appropriate.

"*Nonrecourse Liability*" means a Membership liability with respect to which no Member bears the economic risk of loss as determined under Treasury Regulation § 1.752-1(a)(2).

"*Operating Budget and Business Plan*" has the meaning set forth in Section 5.5 hereof.

"*Operating Expenses*" means: (i) out-of-pocket investment costs, such as brokerage commissions and finders' fees, and transfer taxes; (ii) all expenses of the Company relating to investigating, acquiring, operating, monitoring, managing, leasing, improving, rehabilitating, marketing, advertising, financing and disposing of the Property (including travel and other out-of-pocket expenses); (iii) fees and disbursements to third parties relating to any audit and accounting or bookkeeping or tax services with respect to, the books and records of the Company including the preparation of the periodic reports required to be delivered, tax advice, tax projections, tax returns and K-1's, the costs of verifying distributions, models, valuations and tax allocations; (iv) fees and disbursements of attorneys, consultants, accountants, tax advisors, bookkeepers, administrators, third-party appraisers (to the extent third-party appraisal services are contemplated by this Agreement), other costs of valuation, third-party due diligence, third-party research services, and other professionals (including legal fees in connection with any legal opinions required to be delivered by or on behalf of the Company); (v) interest expense on borrowings permitted by the terms of this Agreement and all expenses incurred in negotiating, entering into, effecting, maintaining, varying and terminating any borrowing or guarantee permitted to be incurred by this Agreement; (vi) all insurance premiums, finance charges, any fees and costs of brokers, agents, attorneys and advisors, and third-party charges for risk management services or similar expenses incurred by the Company any Member or the Manager in connection with the activities and management of the Company (including fidelity and directors' and officers' insurance); (vii) the cost of maintaining records and books of account in relation to the business of the Company; (viii) all costs and expenses incurred in relation to obtaining waivers, consents or approvals pursuant to this Agreement and all reasonable costs and expenses of, and/or incidental to, the preparation of amendments to this Agreement; (ix) all costs and expenses of, and/or incidental to, the preparation and dispatch to the Members of all checks, reports, circulars, forms and notices and any other documents necessary or desirable in connection with the business and administration of the Company, including the cost of all insurance of the Company in connection therewith; (x) all costs and expenses incurred as a result of dissolution of the Company and the disposition of the Property, realization or disposal of the Property pursuant thereto; and (xi) all costs and expenses of any threatened or actual litigation involving the Company and the amount of any judgment or settlement paid in connection therewith, excluding however the costs and expenses of any litigation, judgment or settlement, in all cases as set forth in a validly approved Operating Budget and Business Plan or otherwise approved in writing by the Investor Member.

6

"*Partnership Representative*" has the meaning set forth in <u>Section 8.5</u>.

"*Permitted Transferee*" means a Member described in <u>Section 7.3</u> to whom a Membership Interest may be transferred without compliance with transfer restrictions of Article 7.

"*Person*" means any natural person, corporation, limited liability company, association, partnership (whether general or limited), joint venture, proprietorship, governmental agency, trust, estate, association, custodian, nominee or any other individual or entity, whether acting in an individual, fiduciary, representative or other capacity.

"*Principal Office*" has the meaning set forth in <u>Section 1.4</u>.

"*Profits*" or "*Losses*" mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this paragraph shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses pursuant to this paragraph shall be subtracted from such taxable income or loss;

(iii)     If the value of any Membership asset is adjusted in compliance with Treasury Regulations Section 1.704-1(b)(2)(iv)I or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(iv)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the value of such property for Capital Account purposes notwithstanding that the adjusted tax basis of such property differs from such value;

(v)     If the value of an asset for Capital Account purposes differs from its adjusted tax basis for federal income tax purposes, depreciation, amortization and other cost recovery deductions shall be taken into account in accordance with applicable Treasury Regulations, including Treasury Regulations Section 1.704-1(b)(2)(iv)(g), in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing taxable income or loss;

(vi)     To the extent an adjustment to the adjusted tax basis of any Membership asset pursuant to Code Section 734 is required pursuant to Treasury Regulations Section

1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

(vii)    Any items that are specially allocated to the Members' Capital Accounts pursuant to the provisions of <u>Section 10.1</u> in order to cause the allocation of such items to be respected for federal income tax purposes shall not be taken into account in computing Profits and Losses.

"*Property*" means the property known as the Rangeview Mobile Home Community and Trails End Mobile Home Park, Anchorage, Alaska, all as further described in the PSA.

"*PSA*" means that certain Purchase and Sale Agreement, dated as of March 9, 2022, amended by that certain First Amendment to Purchase and Sale Agreement, dated as of April 25, 2022, that certain Second Amendment to Purchase and Sale Agreement, dated as of November 4, 2022, and that certain Third Amendment to Purchase and Sale Agreement, dated as of December ___, 2022, each by and among TCC MHC Portfolio I Acquisitions II, LLC, a Delaware limited liability company, as buyer thereunder, and each of (i) Stonetown Rangeview, LLC, a Colorado limited liability company, and (ii) Stonetown 6 FB Borrower, LLC, a Colorado limited liability company, collectively, as seller thereunder.

"*Pursuit Costs*"  means all out of pocket costs and expenses including legal and consulting fees incurred by any Party hereto in connection with the acquisition of the Property including, without limitation, all costs and expenses related to : (a) the physical inspection of the Property and related travel expenses incurred in connection therewith; (b) legal, environmental and other due diligence investigation and travel expenses incurred in connection therewith; (c) sourcing potential financing of the Property; (d) required deposits under the PSA; and (e) lender deposits.

"*Reorganization*" means: (i) any consolidation or merger of the Company with or into any other Person, whether or not the Company is the surviving entity; (ii) any conversion of the Company into another entity; (iii) any exchange or other transaction pursuant to which outstanding Membership Interests are converted into other securities, property or money; or (iv) any sale, transfer or other disposition of all or substantially all of the Company's assets in a single transaction or a series of related transactions. A dissolution or liquidation of the Company pursuant to Article 12 will not constitute a "Reorganization" within the meaning of this Agreement.

"*Revised Membership Audit Procedures*" means the provisions of Subchapter C of Subtitle A, Chapter 63 of the Code, as amended by P.L. 114 74, the Bipartisan Budget Act of 2015 (together with any subsequent amendments thereto, Treasury Regulations promulgated thereunder, and published administrative interpretations thereof).

"*Securities Act*" has the meaning set forth in <u>Section 15.1(a)</u>.

"*Subsidiary*" has the meaning set forth in <u>Section 1.7</u>.

"*Substitute Manager*" means a Manager approved or appointed by the Investor Member, in its sole discretion, to replace a Manager pursuant to Article 5.

"*Transfer*" means, with respect to a Member's Membership Interests or the Manager's interests herein (or the interests of any such Person held by other Persons as of the date hereof), whether the word is capitalized or not, the sale, assignment, transfer, withdrawal, mortgage, pledge, hypothecation, exchange or other disposition of any part or all of such Membership Interests, whether or not for value and whether such disposition is voluntary, involuntary, by operation of law or otherwise.

"*Treasury Regulations*" means the regulations promulgated by the United States Treasury Department under the Code. Any reference in this Agreement to a Section of the Treasury Regulations shall be considered also to include any subsequent amendment or replacement of that Section.

## Article 3
## Purpose and Character of the Business

The primary purpose of the Company is to acquire, own, operate, manage, lease, finance, refinance and dispose of the Property, acting either directly or through one or more Subsidiaries. The Company will be and is authorized and empowered to engage in any lawful act or activity for which limited liability companies may be organized under the Act. The Company will be an association among the Members and other Parties only for such specifically authorized business purpose and will not be deemed to create any association among the Members and other Parties with respect to any other activities whatsoever other than the activities within such business purpose described herein. The Company will not engage in any other business without the written consent of the Investor Member.

## Article 4
## New Members; Membership Interests; Certificates

4.1     <u>Admission of New Members</u>. The Investor Member is, as of the Effective Date, the sole Member of the Company. The Investor Member shall have the sole right and authority, in its sole discretion, to admit new members to the Company, on such terms as the Investor Member may, in its sole discretion, determine to be prudent, provided, that, the same shall not have an adverse impact on the rights of Manager hereunder (including, without limitation, Manager's distribution rights under Section 11.1) or increase Manager's obligations or liabilities hereunder (collectively, the "Manager Protections"). Subject to the Manager Protections, the Investor Member may cause this Agreement to be amended to provide for additional classes of Members and to otherwise reflect the admission of new Members as provided for herein. For the avoidance of doubt, the Manager Protections included herein shall not be deemed to impair or diminish the

right of the Investor Member to validly remove the Manager as Manager of the Company as provided for hereunder.

4.2     No Certificates for Membership Interests. The Membership Interests of the Company shall not be certificated unless otherwise determined by the Investor Member.

### Article 5
### Provisions Applicable to Manager

5.1     Rights, Powers and Duties of the Manager.

(a)     The Manager is not a Member and does not have the rights of a "member" of a limited liability company as provided for under the Act.  The Manager shall, subject to the requirement to obtain consent set forth in Section 5.2 and the other rights of Investor Member hereunder, have the exclusive day-to-day management and control of the affairs of the Company and shall have the power and authority to do all things necessary or proper to carry out the purposes and objectives of the Company pursuant to the terms of this Agreement, subject to any then applicable Operating Budget and Business Plan.  Without limiting the generality of the foregoing, the Manager may make, execute, deliver, and perform any and all contracts, commitments, undertakings, consents, restrictions, covenants, warranties, expressions of investment intent and other agreements or arrangements, and may engage in any and all activities and transactions, as may, in the opinion of the Manager, be necessary or appropriate to carry out such purposes and objectives (in all instances, subject to the rights of the Investor Member hereunder and as otherwise set forth in the then applicable Operating Budget and Business Plan). The Manager shall devote such time, effort and skill as may be reasonably required for the conduct of the business and affairs of the Company and, at all times, shall act with Due Care.

(b)     The Manager, for and on behalf of the Company and any Subsidiary, unless otherwise limited by this Agreement, shall have full power and authority, in addition to such powers and authorities as may be provided by law or elsewhere in this Agreement, at the expense of the Company (by direct payment or reimbursement) and, for the avoidance of doubt, at all times subject to the then applicable Operating Budget and Business Plan (or as otherwise approved in writing by the Investor Member):

(i)     to take any action permitted by this Agreement and the Act to accomplish the Company's purposes, including any act customary or reasonably related to acquiring, owning, managing, selling, investing, reinvesting, financing or re-financing the Company's assets including the Property;

(ii)     to pay all expenses relating to the organization of the Company, including, without limitation, legal, accounting, tax advisory services, duplicating and printing, telephone, postage, travel and other expenses and fees (including filing fees) paid or incurred in organizing the Company;

(iii)     subject to the review and approval of the Investor Member for amounts in excess of $50,000.00 on an annual basis to any one such agent, unless expressly provided for in the Operating Budget or Business Plan,  to engage and pay such independent agents, attorneys, accountants, appraisers, custodians, finders, advisers, and any other Persons retained to assist the Company as the Manager may deem necessary or appropriate for the affairs of the Company;

(iv)     to receive, purchase, hold, maintain, sell, exchange, trade or otherwise dispose of, and otherwise deal in and with the assets and property of the Company, including the payment of commissions, fees and expenses relating to such transactions;

(v)     to open, maintain and close bank, money market and custodial accounts for the Company and to draw checks and other orders for the payment of money as may be authorized and approved by the Investor Member;

(vi)     to file, on behalf of the Company, all required local, state, federal and foreign tax returns and other documents relating to the Company;

(vii)     [intentionally deleted];

(viii)     to cause the Company to purchase or bear the cost of any insurance covering the potential liabilities of the Company, the Members, the Manager or any employee or agent of the Company, as well as the potential liabilities of any Person serving at the request of the Manager as a director of a corporation or partner of a partnership in which the Company has an investment, to the extent the Manager, in its reasonable discretion, determines that such coverage is available on reasonable terms and conditions;

(ix)     [intentionally deleted];

(x)     to enter into, make and perform such contracts, agreements and other undertakings, including entering into and providing loans to third-parties, and to do such other acts, as it may deem necessary or appropriate for, or as may be incidental to, the conduct of the business of the Company contemplated by this Agreement, including, without limitation, contracts, agreements, undertakings and transactions with any Member or with any other Person having any business, financial or other relationship with any Member or Members; provided, however, that such transactions with related persons and entities shall be on terms no less favorable to the Company than are generally afforded to unrelated third parties in comparable transactions;

(xi)     to pay compensation for services rendered to the Company, including, without limitation, commissions and finder's fees, and direct expenses relating to the investments of the Company to any brokers or finders;

#26329v10

(xii)     to open, conduct and close cash or other accounts with brokers on behalf of the Company and to pay the customary fees and charges applicable to transactions in such accounts; and

(xiii)    to obtain the Loan and enter into the Loan Documents (as approved by the Investor Member).

(c)     In carrying out its duties and exercising its powers under this Agreement, the Manager shall act with Due Care.

(d)     Third parties dealing with the Company are entitled to rely conclusively upon the power and authority of the Manager as set forth in this Agreement.

5.2     <u>Limitations on Powers of Manager</u>. The following actions ("*Major Decisions*") shall not be taken by the Manager without the prior written consent of the Investor Member which shall not be unreasonably withheld, conditioned or delayed, unless contemplated in the Operating Budget or Business Plan; provided, however, that, subject to the Manager Protections, the Investor Member may, by written notice, cause the Manager to cause the Company or any Subsidiary to take any of the following actions.

(a)     Acquisition by the Company of any direct or indirect interest in land or other real property or interest therein or any debt or equity or other such interest of any Person (other than the acquisition of the Property as contemplated hereby);

(b)     Exercising (or refraining from exercising) or otherwise making any determination as to the rights of buyer under the PSA (whether or not the transactions contemplated thereby are ever consummated) or sending any notices relating thereto;

(c)     Approval of any Operating Budget or Business Plan, provided, that, should Investor Member fail to approve an annual increases in the Operating Budget, Manager shall continue to operate under the previously approved Operating Budget with any increases actually necessary to pay taxes, insurance and scheduled debt payments required to be paid under the terms of the Loan or other debt secured by the Property;

(d)     Any amendment or modification of any Operating Budget or Business Plan;

(e)     Entering into, or causing a Subsidiary to enter into, any loan, financing, refinancing or other similar obligation (other than trade payables) affecting or relating to the Property including the Loan and the Loan Documents or submit any loan application on behalf of the Company or the Property;

(f)     Sending any material correspondence to or have any other material communications with, any governmental agency, except in the ordinary course of business or as required under the Loan;

(g)    Entering  into any contract or agreement under which the total payment or other consideration exceeds $50,000 annually; provided that the Manager may cause the Company or a Subsidiary to enter into any contract (other than with an Affiliate of the Manager) which (i) is terminable without penalty upon not more than thirty (30) days' prior written notice from the Company or Subsidiary, (ii) is entered into in the ordinary course of the Company's or Subsidiary's business, (iii) is for work or services contemplated in the Operating Budget and Business Plan, and (iv) does not obligate the Company and/or Subsidiary to make aggregate payments thereunder in excess of $100,000 annually;

(h)    Entering into any transaction with any Affiliate of the Manager other than as expressly contemplated by an approved Operating Budget or Business Plan or otherwise approved by the Investor Member;

(i)    Entering into any lease affecting or relating to the Property or any part or space thereof that is not in accordance with the leasing guidelines that are included in the then applicable Operating Budget and Business Plan;

(j)    Entering into any material transaction, or paying any fee to, any Affiliate of the Manager except those contemplated under this Agreement or in the Operating Budget or Business Plan;

(k)    Amendment, prepayment, extension, change in the interest rate, other material economic modifications or other material modifications of a mortgage loan affecting the Property or any other Loan or Loan Documents except as required under the Loan or the Loan Documents;

(l)    Except as otherwise expressly permitted herein, directly or indirectly selling, exchanging, encumbering, or otherwise disposing of the Property or any portion or interest therein, or entering into any purchase option or agreement to sell, exchange, or otherwise dispose of the Property or any portion or interest therein;

(m)    Lending money to, or guaranteeing the debts or other obligations, of a Member or any other Person;

(n)    Changing the name or business purpose of the Company;

(o)    Except as required by law, authorize, approve or consent to any labor union activities on or about the Property;

(p)    The admission of any new Member;

(q)    Replacing the Key Management Principals or their Affiliate as the operating members of the Manager;

(r)    Taking any action or inaction that does, or with the passage of time would, make it impossible for the Company to carry on its business;

(s)     Merging or consolidating the Company into any partnership, limited liability company, or other entity;

(t)     Committing an act of Bankruptcy on behalf of the Company;

(u)     Commencing, settling or dismissing litigation by or against the Company;

(v)     Confessing a judgment against the Company or its assets or any portion thereof;

(w)     Causing the Company to engage in any business other than as set forth in Section 3;

(x)     Committing any act in material breach of this Agreement;

(y)     Retaining legal counsel, accountants, auditors, consultants or other professionals on behalf of the Company except as contemplated by the Operating Budget or Business Plan (it being understood and agreed that Wachtel Missry LLP is approved as counsel for the Company);

(z)     Filling the vacancy or otherwise change the identity of a Manager (or the direct or indirect owners thereof);

(aa)     Hire any employees except in the ordinary course of business consistent with  the Operating Budget and the Business Plan;

(bb)     Make any capital expenditure or capital improvement other than in emergency scenarios wherein the life or safety of another Person is threatened with imminent harm or the Property otherwise risks sustaining material damage (it being understood and agreed that the Investor Member will be notified as soon as practicable of such expense and that the Investor Member may thereafter  cause the Company not to incur such expense or to otherwise mitigate such expenditure) or as expressly set forth in any then applicable Operating Budget and Business Plan;

(cc)     Make material alterations to the Property other than as expressly permitted by the Operating Budget and Business Plan and pursuant to plans and specifications approved by the Investor Member;

(dd)     Amend, modify or replace any insurance coverage except extension to existing insurance as required and/or permitted under the Loan Documents;

(ee)     Unless otherwise provided under this Agreement, making any amendment or other modification of the provisions of the terms of this Agreement.

(ff)     Borrow Company or Subsidiary funds; and

14

(gg)    Take any other action which, pursuant to any provision of this Agreement, requires the approval of the Investor Member.

(hh)    Take any action which could increase or otherwise impose liability of or on any guarantor that is an Affiliate of the Investor Member under any Loan.

.

5.3    <u>Sale of Property</u>.  It is expressly understood and agreed that the Investor Member may cause the sale of the Property (through one or more transactions involving either a direct sale of the Property or a sale of the equity interests of the Company) at any time and for any reason. The Manager will cooperate in such sale (which shall be on such terms and for such consideration as designated by the Investor Member, in its sole discretion) and shall execute all such documents as is necessary to effectuate such sale of the Property (or equity interests) as is reasonably required to effectuate the foregoing.  Any such sale as is contemplated by this <u>Section 5.3</u> shall be conducted using such third party brokerage firms as are selected by the Investor Member, in its sole discretion and the Investor Member shall control such sales process and the Manager will implement the directions of the Investor Member in furtherance thereof.  For the avoidance of doubt, neither the Property nor any direct or indirect interest therein may be sold (regardless of how such sale is structured) without the express written consent of the Investor Member.

5.4    <u>Reimbursement of Expenses</u>.

(a)    Operating Expenses (to the extent set forth in the applicable Operating Budget and Business Plan or otherwise approved in writing by the Investor Member) shall be borne by the Company. The Company shall pay Operating Expenses directly or shall reimburse the Manager or its Affiliates for payment thereof, as the case may be. All Operating Expenses are Company costs and reimbursable to the Manager and its Affiliates, as the case may be, and shall be due and payable promptly following receipt of invoices therefor to the extent such expenses are validly incurred hereunder and are either set forth in the applicable Operating Budget and Business Plan or are otherwise approved in writing by the Investor Member.

(b)    The Company shall bear all costs for organizing the Company, including legal, consulting, and accounting.

(c)    It is understood and agreed that, upon the closing of the acquisition contemplated by the PSA, the Investor Member shall be reimbursed by the Company for all Pursuit Costs incurred in connection with the entrance into this Agreement, the consummation of the transactions contemplated by the PSA and all other actions taken in connection therewith. Furthermore, the Manager shall be reimbursed for such Pursuit Costs it has incurred prior to the execution of the Deposit Letter (as specifically set forth therein) and such other Pursuit Costs as are approved by the Investor Member, in its sole discretion. It is understood and agreed that, following the date of execution of the Deposit Letter, no

15

Pursuit Costs may be incurred by the Manager without the express written consent of the Investor Member.  For the avoidance of doubt, the legal fees and expenses incurred by the Investor Member and/or the Manager prior to entering into this Agreement shall be paid by each such Person separately and shall not be borne by the Company or any Subsidiary thereof.

5.5    Budgets and Business Plans.

(a)    Operating Budget and Business Plan.  The operating budget and business plan (the "*Initial Operating Budget and Business Plan*") for the Fiscal Year ending December 31, 2003 is attached as Exhibit [xx] hereto.  The Manager shall prepare a proposed operating budget and business plan for the Property for all ensuing Fiscal Years (each operating budget and business plan is referred to as a ("*Proposed Operating Budget and Business Plan*") forty-five (45) days prior to the end of any Fiscal Year as to which such Operating Budget and Business Plan apply.  The Investor Member shall have fifteen (15) days to review the Proposed Operating Budget and Business Plan. The Manager shall, if reasonably requested by the Investor Member, prepare a revised version of the Proposed Operating Budget and Business Plan which shall be resubmitted to Investor Member for review and approval (such approval not to be unreasonably withheld, conditioned or delayed). Each Proposed Operating Budget and Business Plan shall include the following: (a) estimated revenues and a detail of all expenses (including real estate taxes and debt service); (b) leasing parameters and guidelines; and (c) a description of any anticipated capital expenditures and improvements for each month of the upcoming year.

The Proposed Operating Budget and Business Plan for each Fiscal Year after the Initial Operating Budget shall be submitted by the Manager no later than November 15th in the year preceding the Fiscal Year covered by the Proposed Operating Budget and Business Plan. Upon approval of each Proposed Operating Budget and Business Plan by the Investor Member, including, but not limited to, the Initial Proposed Operating Budget and Business Plan, such Proposed Operating Budget for the applicable Fiscal Year shall be referred to as the "*Operating Budget and Business Plan*".  Any notice of disapproval of any budget and business plan shall specify the particulars with which the Investor Member disagrees. If a Proposed Operating Budget and Business Plan is not approved by the Investor Member before commencement of any applicable Fiscal Year, then, until the Proposed Operating Budget and Business Plan  is approved by the Investor Member (such approval not to be unreasonably withheld, conditioned or delayed), the Manager shall cause the Property to be operated in accordance with the Operating Budget  and Business Plan then in effect and approved by the Investor Member with increases for any actual increases in taxes, insurance and scheduled debt payments under the Loan and such other changes and variances as the Investor Member may approve in writing in its sole discretion.   For the avoidance of doubt, the Investor Member may reasonably change, modify or vary the Operating Budget and Business Plan at any time, in its sole discretion.

5.6    Other Activities of Manager and Members. The Manager and any other Member including the Investor Member may, during the term of the Company, engage in and possess an interest for its own account in other business ventures of every nature and description,

independently or with others; and neither the Company nor any Member nor the Manager, by virtue of this Agreement, shall have any right in and to said independent ventures or any income or profit derived therefrom. Notwithstanding the foregoing, the Manager shall, and shall cause all applicable employees and Affiliates to, devote such time and attention to the Company, its Subsidiaries and the Property as is reasonably necessary to fulfill its obligations and duties hereunder and the Manager shall, at all times, conduct itself, and cause its employees and Affiliates to conduct themselves with Due Care.

5.7     Limitation of Liability; Indemnification. Except to the extent otherwise required by applicable law or as otherwise set forth herein, no Member or Manager or former Member or Manager will be liable, responsible or accountable in damages or otherwise to the Company, to any Members or Managers or former Members or Managers, for any act or omission made in good faith on behalf of the Company.

(a)     Indemnification. The Company will indemnify an Indemnitee to the fullest extent permitted by the Act, but such indemnity will not extend to any conduct by the party seeking indemnification that is determined by a court of competent jurisdiction to constitute bad faith, fraud, gross negligence, or willful misconduct. Any indemnity under this Section 5.7 will be paid from, and only to the extent of, Company assets and no Member will have any personal liability on account thereof.

(b)     Entitlement to Indemnification.   An Indemnitee will be entitled to indemnification under Section 5.7(a) if (i) it is determined in any action, suit or proceeding relating to the Indemnity Claim that the act or omission of the Indemnitee does not constitute bad faith, fraud, gross negligence, or willful misconduct, or (ii) the Investor Member determines that such indemnification is proper in the circumstances. To the extent that an Indemnitee has been successful on the merits or otherwise in defense of an Indemnity Claim, such Indemnitee will be indemnified against all Indemnity Expenses in connection therewith, notwithstanding that such Indemnitee has not been successful on any other claim, issue or matter related to such Indemnity Claim.

(c)     Permissive Indemnification.   The Company is authorized to make any indemnification, other than and apart from that required under S11ection 5.7(a), which is approved by the Investor Member and not prohibited by law.

(d)     Interim Advances.  Expenses (including, without limitation, attorneys' fees) incurred by any Indemnitee in defending an Indemnity Claim, will be paid by the Company in advance of the final disposition of such Indemnity Claim upon the Company's receipt of an undertaking by such Indemnitee to repay such amount (and evidence of the financial ability to repay such amount) if and to the extent that it will be ultimately determined that such Indemnitee is not entitled to be indemnified by the Company.

(e)     Maintenance of Insurance.  The Manager, subject to the approval of the Investment Member  will have the power to, and shall, consistent with its duties hereunder, purchase and maintain, at the expense of the Company, insurance on behalf of any Person who is or was a Manager, Member or employee of the Company against any liability

17

asserted against such Person and incurred by such Person in any such capacity or arising out of such Person's status as such, whether or not the Company would have the power to indemnify such Person against such liability under applicable law.  When, and if, the Company obtains any such insurance, the Company will not be required to maintain the same in effect, but the Company will make reasonable efforts to notify the covered Person in writing within five (5) business days after making any decision not to renew or replace such coverage.  The maintenance of any such insurance will not diminish the Company's liability for indemnification under the provisions hereof.  Any claim for reimbursement or indemnification hereunder will not be denied by the Company on the basis that the same may or will be covered by any insurance maintained by the Company, but no Indemnitee will be indemnified twice for the same Indemnity Expenses.

(f)    <u>Notification and Defense of Claims</u>.  Promptly after receipt of any notice concerning the commencement of an Indemnity Claim, if a claim in respect thereof is to be made against the Company, the Indemnitee will give prompt notice thereof to the Manager.  The Company may assume the defense of any Indemnity Claim and will not be obligated to furnish separate counsel to the Indemnitee in any action in which the Company and the Indemnitee are joined.  After notice from the Company to the Indemnitee of its election to assume the defense of an Indemnity Claim, the Company will not be liable for any Indemnity Expenses subsequently incurred, except in cases where separate representation is required as a result of a non-waivable conflict of interest.  No settlement of any Indemnity Claim will be made without the approval of the Company.

(g)    <u>Non-Exclusivity of Paragraph</u>.  The indemnification authorized in and provided by this <u>Section 5.7</u> will not be deemed exclusive of and will be in addition to any other right to which any Person may be entitled under any statute, rule of law, provision of the Certificate of Formation, provision of this Agreement, other agreement, vote or action of the Members, or otherwise.

(h)    <u>Release and Waiver of Subrogation</u>.  Each Member and Manager hereby releases and discharges the Company and each other Member and each Manager from any and all liability with respect to any and all loss, claims, damages, liabilities, expenses, judgments, fines, settlements and other amounts, including attorneys' fees to the extent that the same is compensated for by the net proceeds of any insurance maintained by the Company or by any of the Members or the Manager.  Each Member and Manager agrees to cause any policies of insurance maintained by such Member or Manager with respect to the Company to include a waiver of subrogation provision.

(i)    <u>Definitions</u>.  For purposes hereof:

"<u>Indemnitee</u>" means and includes each Manager, Member, former Manager, former Member, their respective members, shareholders, partners, controlling Persons, officers, directors and employees and their respective successors in interest.

18

"Indemnity Claim" means and includes any and all claims, demands, actions, suits or proceedings (civil, criminal, administrative or investigative) in which any Indemnitee is involved, as a party or otherwise, by reason of its management of, or involvement in, the business and affairs of the Company, or the rendering of advice or consultation with respect thereto, or otherwise by reason of the fact that such Indemnitee is or was a Manager or a Member.

"Indemnity Expense" means and includes any and all loss, claims, damages, liabilities, expenses, judgments, fines, settlements, and other amounts, including, without limitation, attorneys' fees and paralegal charges, reasonably and actually incurred by an Indemnitee in connection with any Indemnity Claim.

5.8     Additional Managers. Except as provided in this Article 5, no Person shall be admitted to the Company as a Manager without the consent of the Investor Member.

5.9     Withdrawal. No Manager shall resign as a manager of the Company or otherwise withdraw from the Company unless the Manager provides a Substitute Manager to the Company who is reasonably approved by the Investor Member.

5.10    Reserved.

5.11    Removal of Manager. A Manager may be removed by the Investor Member, either (i) for any reason if such removal occurs on or after the first anniversary of the acquisition of the Property; or (ii) at any time for Cause (as hereinafter defined). If a Manager is removed for Cause, such Manager shall be deemed to have surrendered to the Company its entire interest in the Company as a Manager and shall be entitled to no compensation for such interest, except that any Property Management Fees then outstanding shall not be affected thereby. For purposes of this Section 5.10, "*Cause*" means:

(a)     A Bankruptcy Event of the Manager or any Key Management Principal.

(b)     The determination by Investor Member that the Manager or any Affiliate or any officer, director, member, employee, principal, shareholder, general partner or agent of Manager or any Affiliate thereof (collectively, the ("Manager Parties"):

(i)     committed an act of fraud, embezzlement, misappropriation or willful misconduct upon the Members or upon the Company or the Property or was grossly negligent or breached its Duty of Care in its duties with respect to the Company or the Property which has a material adverse effect on upon the Company, Investor Member, any Subsidiary or Affiliate thereof or the Property (each a "Bad Act"); provided, however, no Cause for such fraud, embezzlement, misappropriation or willful misconduct, shall be deemed to have occurred if Manager elects to exercise a Bad Act Cure. For the purposes hereof, the term "Bad Act Cure" means that, with respect to the occurrence of a Bad Act, (x) within fifteen (15) days after the discovery of such act or omission, Manager or the applicable Affiliate of the Manager terminates the employment of the officer, employee, agent

or other Person who committed such act or omission, and (y) cures such act or omission, including, without limitation, reimbursing the Company, all Subsidiaries and/or the other Member, as applicable, for any and all actual losses, damages, liabilities, out of pocket costs and expenses (including reasonable attorney fees), suffered or incurred by any of them arising out of, related to, or in connection with, such act or omission (provided, however, that the Manager may avail itself of the foregoing Bad Act Cure (together with the cure rights set forth in clause (viii) below) no more than twice, in the aggregate, during the term of this Agreement);

(ii)   was in material breach of its obligations under this Agreement and failed to cure such breach within thirty (30) days of written notice from the Investor Member providing reasonable details as to such alleged breach; provided that if such breach is not reasonably capable of cure within such thirty-day period, Manager shall not be in default hereunder so long as it commences such cure within such thirty-day period and thereafter diligently pursues the same to completion and such action or omission is cured within ninety (90) days from the date that the original notice specifying the applicable breach was delivered to the Manager;

(iii)   intentionally caused or permitted the Company or any Subsidiary to take any Major Decision or other action (or fail to take any action) without the requisite approval of the Investor Member as required hereunder and the same has a material adverse effect upon the Company, the Investor Member, any Subsidiary or Affiliate thereof or the Property;

(iv)   caused the occurrence of an event of default under a Loan Document as a result of such Person's willful misconduct, bad faith or gross negligence and the same has a material adverse effect upon the Company, any Subsidiary or Affiliate thereof or the Property;

(v)   failed to maintain insurance coverage or failed to pay insurance deductible amounts (to the extent funds are available therefor) as required by this Agreement or any Loan Documents;

(vi)   initiated or threatened in writing to initiate legal action to dissolve the Company, to effectuate a partition of Company or Subsidiary assets, or to declare this Agreement invalid;

(vii)   failed to provide Investor Member with access to Company or Subsidiary funds within ten (10) business days after written demand and/or failed to transfer Company or Subsidiary funds to an account controlled by Investor Member within ten (10) business days after written demand;

(viii)   committed a felony (other than a felony related to the operation of motor vehicles that do not involve manslaughter or murder) or other crime of moral turpitude that has a material adverse effect upon the Company, any Subsidiary or Affiliate thereof or the Property (including with respect to the reputation of the

Investor Member and its Affiliates); provided that, during the term of this Agreement, (x) if such crime is committed by any Manager Parties other than a Key Management Principal, (y) is unrelated to the Property, and (z) the Manager Party involved is terminated and promptly replaced with a qualified replacement reasonably acceptable to Investor Member, then the same shall not constitute a for Cause event; provided, however, that the Manager may avail itself of the foregoing cure right (together with the Bad Act Cure rights set forth in clause (i) above) no more than twice, in the aggregate, during the term of this Agreement;

      (ix)    failed to cause the Company to pay all applicable taxes (to the extent that Company funds are available for such use);

      (x)    failed to provide Investor Member with access to books and records of the Company or any Subsidiary within ten (10) business days after written demand to do so;

      (xi)    took any action for the purpose of hindering or delaying the exercise by the Investor Member of its rights under this Agreement (it being understood and agreed that good faith disputes of the terms hereof shall not constitute "Cause" for purposes of this clause (xi)); or

(c)    None of the foregoing Cause events shall be deemed Cause events unless and until the same has not been cured following written notice and a ten (10) business day cure period (if no cure period is specified or such other period as is specified for such Cause event).

(d)    Either (A) both of the Key Management Principals cease to be members of Manager with decision and operational control rights over the Manager or otherwise actively engaged in the day-to-day management and operations of the Manager (unless the Investor Member reasonably determines that  the absence of one of the Key Principals has a material adverse effect upon the Company or the Property, in which case the absence of such Key Principal from the day to day management of the Manager will constitute "Cause" hereunder or  (B) there is otherwise a violation by the Manager of the restrictions set forth in Article VII;

(e)    Upon removal of the Manager for Cause, the Manager shall cease to have any further interest in the Company (and, for the avoidance of doubt, shall have no right to vote on or consent to any Major Decision or other decision affecting the Company or the Property) and shall receive no further distributions hereunder. Furthermore, in the event that the Manager is removed as a result of a Bad Act, the Manager shall repay to the Company (for immediate distribution to the Investor Member) all sums it has received as distributions pursuant to Section 11.1 hereunder to the extent required to reimburse the Investor Member for its actual damages suffered as a result of the applicable conduct giving rise to such removal event (including reasonable attorney fees and expenses).   The foregoing shall only apply if a written claim for actual damages is made by Investor Member no later than 180 days following the event giving rise to the for-Cause removal of

#26329v10

Manager.  The Churchlight Communities LLC, a credit-worthy Affiliate of TCC has executed this Agreement for purposes of guarantying the Manager's obligations to repay to the Company the foregoing sums.

(f)      Upon the removal of the Manager other than for Cause (it being understood and agreed the removal of the Manager for Cause shall result in the Manager receiving no further distributions hereunder whatsoever and, for all purposes, otherwise being divested of any interest of any kind in the Company), the Investor Member shall have the unilateral right to repurchase the interests of Manager for a price equal to the distributions which the Manager would receive under Section 11 of this Agreement if the Property were sold for a gross purchase price equal to the "Fair Market Value" thereof, such repurchase price to be paid, in cash, to the Manager no later than one hundred and eighty (180) days after the determination of such Fair Market Value; provided that, such Fair Market Value is no lower than the Floor Value (as defined below).  As used herein the Floor Value shall mean a gross sale price for the Property at which the Investor Member would receive an MOIC of at least 2.00 and an IRR of at least 20%, in each case, from distribution under Section 11 of this Agreement.   As used herein, the term "MOIC" means with respect to the Investor Member, (x) the sums of all previous distributions of under Section 11 of this Agreement, made to the Investor Member divided by (y) the aggregate Capital Contributions made by the Investor Member.   As used herein, the term "Fair Market Value" shall be defined and determined as follows:

(i)      Investor Member shall provide Manager with an appraisal of the Property commissioned at the sole expense of Investor Member (the "IM Appraisal" and the appraised value determined thereby, the "IM Appraised Value"). Within ten (10) business days of its confirmed receipt of the IM Appraised Value, the Manager shall provide notice to Investor Member whether it accepts or rejects the IM Appraised Value. If the Manager accepts the IM Appraised Value, that value shall become the final "Fair Market Value." Failure to timely respond shall be deemed acceptance of the IM Appraised Value. If the Manager rejects the IM Appraised Value, the Manager shall notify Investor Member in writing (the "Rejection Notice") and shall commission a second appraisal of the Property at the sole expense of the Manager, (the "M Appraisal" and the appraised value determined thereby, the "M Appraised Value"), to be delivered to IM Member within thirty (30) days of providing (or being deemed to provide) the Rejection Notice.  If the M Appraised Value is within ten percent (10%) of the IM Appraised Value, the values shall be averaged in order to derive the Fair Market Value. If the M Appraised Value is not within ten percent (10%) the IM Appraised Value, each of the respective appraisers retained by Manager and the Investor Member shall, within ten (10) days of receipt of the M Appraisal, jointly agree upon a qualified, third party appraiser who shall then promptly perform an independent appraisal of the Property (such appraisal the "Third Appraisal" and such appraised value, the "Third Appraised Value").  If a Third Appraisal is conducted, all three appraisals will be paid for by the Company. The Fair Market Value shall be the median of the IM Appraised Value, the M Appraised Value and the Third Appraised Value. All

22

appraisers retained pursuant to the provisions of this Agreement shall be independent MAI qualified appraisers with no less than ten (10) years of commercial real estate experience in the appraisal of mobile home parks.  Any appraisal must be made (a) on an all-cash sale basis without reduction for any lien or encumbrance against the Property and (b) in compliance with then current Uniform Standards of Professional Appraisal Practice.

5.12    <u>Replacement of a Manager</u>.  In the event of (a) the wrongful withdrawal of a Manager in violation of <u>Section 5.9</u>, (b) the removal of a Manager pursuant to <u>Section 5.11</u>, or (c) the occurrence of any other event that causes a Manager to be dissociated from the Company under Section 15-601 of the Act, then the Investor Member may, in is sole discretion, appoint a Substitute Manager.

5.13    <u>Loans and Guarantees.</u> The Manager shall cause the Company to incur a Loan to finance the acquisition of the Property on such terms as the Investor Member may approve in its sole discretion.  Any non-recourse carve-out guarantees, completion guaranties, environmental indemnities or other recourse obligations in connection with the Property (each a "*Guarantee*") shall be provided by (i) credit-worthy Affiliates  of the Manager or its Affiliates (collectively, the "*Manager Guarantors*"), and (ii) Maplewood Partnership Interests LLC, a credit-worthy Affiliate of the Investor Member ("*Investor Member Guarantor*").  Each of the Manager, the Investor Member, the Manager Guarantors and the Investor Member Guarantor will enter into a cross—indemnification and contribution agreement prior to the making of any guaranties hereunder.  In the event that the Manager is removed as Manager hereunder, the Investor Member shall use its commercially reasonable efforts to have the applicable Guarantors released from their obligations under any Guarantee and, if unable to obtain such release, the Investor Member shall cause a credit-worthy Affiliate of the Investor Member to indemnify, defend and hold harmless the applicable Guarantors from and against all liabilities including reasonable legal fees and expenses (but excluding, in all instances, special, consequential and punitive damages) (collectively, "*Guarantor Losses*") arising under such Guaranties after the date of such removal other than as may have arisen on account of the acts or omissions of the Manager or any Affiliate thereof raising prior to the date of such removal.  The Company shall indemnify, defend and hold harmless the Manager and any Guarantor from any Guarantor Losses arising on account of its executing the aforementioned Guaranties other than as may have arisen on account of the acts or omissions of the Manager or any Affiliate thereof except for where such act or omission is solely caused by Investor Member's direction or by Investor's Member's delay or denial of an approval required hereunder.  The Manager and the Manager Guarantors will indemnify, defend and hold harmless the Company, the Investor Member and the Investor Member Guarantors from and against any and all Guarantor Losses arising from the actions or omissions of the Manager or any Affiliate thereof and the Investor Member and the Investor Member Guarantor will indemnify, defend and hold harmless the Manager and the Manager Guarantors from and against any and all Guarantor Losses arising from the actions or omission of the Investor Member or any Affiliate thereof.   Notwithstanding the foregoing sentence, Manager's and the Manager Guarantor's indemnification obligation under the foregoing sentence shall be limited solely to those Guarantor Losses arising under that certain non-recourse guaranty executed on or about the date hereof.

23

5.14    Management Fees.

(a)    Property Management Fee. From and after the date hereof, a property management fee (the "*Property Management Fee*") shall be paid monthly in arrears, to the Manager or its designated Affiliate, all pursuant to the terms of a Property Management Agreement (the "PMA") to be entered into between the Manager (or such designated Affiliate) on or about the date hereof.  The Property Management Fee shall be equal to three percent (3%) per annum of total gross rental income of the Property.  It is understood and agreed that if the Manager is removed as Manager (or the PMA is terminated) for any reason whatsoever, the foregoing Property Management Fees shall immediately cease to be payable to the Manager or its designated Affiliate and any PMA in effect shall immediately and automatically terminate.

(b)    Asset Management Fee.   From and after the date hereof, an asset management fee (the "*Property Management Fee*") shall be paid monthly in arrears, to the Manager or its designated Affiliate, all pursuant to the terms of an Asset Management Agreement (the "AMA") to be entered into between the Manager (or such designated Affiliate) and the Company on or about the date hereof.  The Asset Management Fee shall be equal to three percent (3%) per annum of total gross rental income of the Property.  It is understood and agreed that if the Manager is removed as Manager (or the AMA is terminated) for any reason whatsoever, the foregoing Asset Management Fees shall immediately cease to be payable to the Manager or its designated Affiliate and any AMA in effect shall immediately and automatically terminate.

(c)    Acquisition Fee.  Upon the acquisition of the Property as contemplated hereby, the Manager shall be paid by the Company a one-time acquisition fee of 1% of the purchase price payable under the PSA, which shall be paid to the Manager by the Company upon the Effective Date.

**Article 6**
**Provisions Applicable to Members**

6.1    Limited Liability. An obligation of the Company, whether arising in contract, tort, or otherwise, is not the obligation of any Member. No Member is personally liable, directly or indirectly, by way of contribution or otherwise, for an obligation of the Company solely by reason of being a Member, even if the Member participates in the management and control of the Company.

6.2    No Participation in Management. No Member, as such, shall take any part or participate in the conduct of or have any control over the business of the Company, and no Member, as such, shall have any right or authority to act for or to bind the Company, unless otherwise expressly provided for under this Agreement.

6.3    No Withdrawal or Dissolution. No Member shall at any time be permitted to withdraw from the Company. No Member shall have the right to have the Company dissolved and

24

the death, insanity, assignment, other transfer or termination of interest, bankruptcy, retirement, resignation or expulsion of a Member shall not dissolve or terminate the Company.

**Article 7**
**Transfers**

7.1     Registration, Transfer and Exchange. The Company shall keep at the Principal Office an original copy of this Agreement in which the Manager shall reflect all transfers of outstanding Membership Interests on successive amendments of **Schedule A** that are made pursuant to Article 13; provided, however, that the Manager shall not reflect on **Schedule A** any transfer that is not made in compliance with this Article 7. The Company may treat any Person in whose name Membership Interests are recorded on **Schedule A** to this Agreement as the absolute owner of such Membership Interests. The Manager shall deliver a copy of each amendment of **Schedule A** to each Member promptly after each amendment is executed, provided that, a failure of the Manager to deliver a copy of any amendment to the Members shall not invalidate such amendment.

7.2     Restriction on Transfers.  In addition to any restrictions imposed by the federal securities laws and any applicable state securities or "*blue-sky*" laws, (x) the Manager may not Transfer any part of its interest in the Company to any other Person nor may it permit any indirect Transfer in the Manager to occur and (y) no Member may transfer or permit to be transferred (directly or indirectly) all or any part of any Membership Interests, whether for consideration or not, and no transferee thereof shall have any rights in the Company or be or have any rights as a Member with respect to all or any part of any such Membership Interests attempted to be transferred, and any such attempted transfer of all or any part of a Membership Interest or other interest in the Company shall be entirely null and void, unless: (a) to a Permitted Transferee as set forth in Section 7.3; or (b) the Investor Member consents to the applicable Transfer; and (c) the transferor and the transferee comply with the provisions of Section 7.5 of this Agreement.  The appropriate Company records and any certificates representing the Membership Interests shall be noted to prevent any transfers in violation of this Section 7.2. No Member may transfer any portion of such Member's rights in or obligations to the Company as a Member except pursuant to a transfer of Membership Interests. Any proposed transfer under this Article 7, including a transfer to a Permitted Transferee, shall be subject to any restrictions or prohibitions on transfers as set forth in the Loan Documents.

7.3     Permitted Transferee. Subject to Section 7.5, a Member (or the holders of any direct or indirect interest therein) may transfer or permit to be transferred (directly or indirectly) all or any part of such Person's Membership Interest (or with respect to the holder of any direct or indirect interest in such Member, all or any portion of such interest holder's interest in such Person) and the Manager may permit transfers of interests in the Manager to:

(a)     a Family Member;

(b)     an Affiliate of a Family Member (provided that the loss of Affiliate status will be deemed a transfer subject to the restrictions under this Article 7);

25

(c)     any recipient of such interests by will or by intestate succession or operation of law; and

(d)     any other Person with the written consent of the Investor Member.

7.4     <u>Transfer by Legal Process</u>. Upon any involuntary transfer of all or any portion of the Membership Interests of a Member pursuant to a levy of execution, foreclosure of pledge, garnishment, attachment, divorce decree, bankruptcy or other legal process (or by operation of law resulting from disability, liquidation, dissolution or winding-up of a Member), such Member shall cease to be a Member with respect to any Membership Interests so transferred and the transferee shall have no right to become a Member or vote in any Membership matters unless admitted by the Manager, subject to compliance with the provisions of <u>Section 7.5</u>. If the transferee does not become a Member, the transferee shall be merely an assignee with the rights described in Section 17-703 of the Act.

7.5     <u>Conditions to Permitted Transfers</u>. No transfer otherwise permitted by any provisions of this Agreement shall be valid unless and until the following conditions are satisfied (any of which may be waived by the Investor Member in its discretion):

(a)     The transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such transfer and confirm the agreement of the transferee to be bound by the provisions of this Agreement; <u>provided, however</u>, that in the case of a transfer of Membership Interests at death or involuntarily by operation of law, the transfer shall be confirmed by presentation to the Company of legal evidence of such transfer, in form and substance satisfactory to counsel of the Company.

(b)     Except in the case of a transfer of Membership Interests or interests in the Manager at death or involuntarily by operation of law, where no opinion of counsel is required, the transferor shall furnish to the Company an opinion of counsel, which counsel and opinion shall be satisfactory to the Company, to the effect that:

(i)     The transfer will not cause the Company to be treated as a "*publicly traded partnership*" within the meaning of Code Section 7704;

(ii)     The transfer is exempt from all applicable registration requirements and such transfer will not violate any applicable federal and state laws regulating the transfer of securities; and

(iii)     The transfer will not cause the Company to be deemed to be an "*investment company*" under the Investment Company Act of 1940.

(c)     The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interests transferred and any other information reasonably necessary to permit the Company to file all required federal and

state tax returns and other legally required information statements or returns. The Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Membership Interests or transfer in interests in the Manager until it has received such information.

(d)     The transferee shall reimburse the Company for all costs and expenses reasonably incurred by the Company in connection with such transfer including, without limitation, legal fees and costs of the preparation, execution, filing or publishing of any amendment to the Certificate of Formation or this Agreement.

(e)     Notwithstanding anything else in this Agreement to the contrary, no new obligations will be created by a transfer of a Membership Interest with regard to a transferee.

7.6    Resignation. No Member or Manager shall be entitled to resign, retire or otherwise withdraw from the Company before the dissolution and winding up of the Company pursuant to Article 12 without the consent of the Investor Member.


## Article 8
## Books of Account; Reports and Fiscal Matters

8.1    Books of Account; Place; Access.

(a)     The Manager shall maintain books of account on behalf of the Company at the Principal Office or such other place as may be designated by the Investor Member. All Members shall at all reasonable times have access to and the right to inspect the same. The Manager will ensure that the Company maintains a system of accounting and shall maintain the books of account established and administrated in accordance with sound principles consistently applied and consistent with similar companies involved in similar activities and will set aside on its books all such proper reserves as shall be required pursuant to the Operating Budget and Business Plan.

(b)     Unless otherwise determined by the Investor Member, the Manager shall ensure that the Company's books of account and any and all documents, contracts, letters, papers, securities and instruments of leases and titles belonging to and relating to the Company and its activities and affairs shall be kept and maintained at the Principal Office. Subject to applicable law, each of the Members shall have full and free access, during normal business hours and upon reasonable notice, to inspect, (by itself or with its representatives, accountants or lawyers), the Company's books and records and such other documents as referred to above. If required by the Company's counsel, the Members shall sign a customary confidentiality undertaking prior to such inspection. This Section 8.1 shall not limit any rights that any Member may have under applicable law.

8.2    <u>Financial Information</u>. The Manager shall cause to be prepared and delivered to each of the Members summary financial information in accordance with <u>Section 8.7</u> below[1].

8.3    <u>Tax Information</u>.  Unless otherwise provided for in this Agreement, within ninety (90) days after the close of each Fiscal Year, all necessary tax information shall be transmitted to all Members.

8.4    <u>Tax Elections and Accounting</u>.

(a)    The Manager, in consultation with the Company's tax advisers and the Investor Member (who shall have final authority as to all decisions made with respect to the Company including all decisions to be made with respect to tax and accounting decisions), shall make or refrain from making any elections required or permitted to be made by the Company under the Code and shall choose the Company's tax accounting method from all available tax accounting methods. The Manager may, with the written approval of the Investor Member, at the time and in the manner provided in Treasury Regulations Section 1.754-1(b), cause the Company to elect pursuant to Code Section 754 to adjust the basis of the assets of the Company in the manner provided in Code Sections 734 and 743.

(b)    The Manager shall cause to be prepared by March 31 following each Fiscal Year of the Company and filed, on or before their respective due dates (as the same may be extended by Manager to October 15 at Manager's election), all federal and state income tax returns of the Company for such taxable year and shall take all action as may be necessary to permit the Company's regular accountants to prepare and timely file such returns. Schedule K- 1 of Form 1065 shall be sent to the Members by March 31 (or such extended date) following the end of each taxable year reflecting each Member's pro rata share of income, loss, credit and deductions for such taxable year.

8.5    <u>Partnership Representative</u>.

(a)    <u>Designation of the Partnership Representative</u>. The Investor Member is hereby designated the "partnership representative" of the Company, as provided in the regulations promulgated under Section 6223 of the Code, as amended by the Revised Membership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law (the "*Partnership Representative*").   The Investor Member may change the aforementioned designation such that the Manager is the Partnership Representative at any time but the Manager shall not make any decisions in connection with such designation other than as authorized by the Investor Member.  Each Member will execute, certify, acknowledge, deliver, swear to, file and record all documents necessary or appropriate to evidence its approval of this designation as the Partnership Representative and, as applicable, the designation of the Designated Individual.  In such capacity the Partnership

---

[1] NTD: All reporting under review.

Representative will represent the Company in any disputes, controversies or proceedings with the Internal Revenue Service or with any state, local, or non-U.S. taxing authority and is hereby authorized to take any and all actions that it is permitted to take by applicable legal requirements when acting in that capacity.  The Partnership Representative will be entitled to take such actions on behalf of the Company in any and all proceedings with the Internal Revenue Service and any other taxing authority as it reasonably determines to be appropriate and that is consistent with this Section 8.5(a).  The Partnership Representative will be reimbursed by the Company for all out-of-pocket costs and expenses reasonably incurred in connection with any such proceeding, and will be indemnified by the Company (solely out of Company assets) with respect to any action brought against such Partnership Representative in connection with the settlement of any such proceeding. Each Member reserves the right to retain independent counsel of its choice at its expense (which counsel will be entitled to prior review of submissions by the Company in respect of any dispute with relevant taxing authorities).  The Company will indemnify the Partnership Representative for, and hold it harmless against, any claims made against it in its capacity as partnership Representative.  Nothing in this Section 8.5(a) limits the ability of any Member to take any action in its individual capacity relating to the Company that is left to the determination of an individual Member under Sections 6222 to 6231 of the Code or any similar provision of state or local law. Expenses incurred by the Partnership Representative will be borne by the Company. Such expenses will include, without limitation, fees of attorneys and other tax professionals, accountants, appraisers and experts, filing fees and reasonable out-of-pocket costs and expenses.  Any decisions made by the Partnership Representative, including, but not limited to, whether or not to settle or contest any tax matter, whether or not to extend the period of limitations for the assessment or collection of any tax and the choice of forum for such contest will be made in the Partnership Representative's sole and absolute discretion.

(b)     Revised Membership Audit Procedures.  In addition to the matters addressed in Section 8.5(a), in respect of tax years in which the Revised Membership Audit Procedures are in effect, the Members acknowledge and agree that it is the intention of the Members to minimize any obligations of the Company to pay taxes and interest in connection with any audit of the Company and/or any partnerships of which the Company is a partner, by means of annual elections under Section 6221(b) if available, and, if such elections are not available (or not made), by means of elections under Section 6226 of the Code and/or the Members filing amended returns under Section 6225(c)(2), in each case as amended by the Revised Membership Audit Procedures.  The Members agree to cooperate in good faith, including by timely providing information reasonably requested by the Partnership Representative and making elections and filing amended returns reasonably requested by the Partnership Representative, and the Partnership Representative will make such elections as it determines in its discretion to give effect to the preceding sentence.  The Company will make any payments it may be required to make under the Revised Membership Audit Procedures and the Partnership Representative will allocate any such payment among the current or former Members of the Company for the "reviewed year" to which the payment relates in a manner that reflects the current or former Members' respective interests in the Company for such "reviewed year" and any other factors taken

29

into account in determining the amount of the payment (with the intent of apportioning the payment in the same manner as if the Company had made the election under Section 6226 of the Code and the payment had been assessed directly against such Member).  To the extent payments are made by the Company on behalf of or with respect to a current Member in accordance with this <u>Section 8.5(b)</u>, such amounts will, at the election of the Partnership Representative, (i) be applied to and reduce the next distribution(s) otherwise payable to such Member under this Agreement or (ii) be paid by the Member to the Company within thirty (30) days of written notice from the Partnership Representative requesting the payment.  In addition, if any such payment is made on behalf of or with respect to a former Member, that Member will pay over to the Company an amount equal to the amount of such payment made on behalf of or with respect to it within thirty (30) days of written notice from the Partnership Representative requesting the payment.  In respect of tax years in which the Revised Membership Audit Procedures are in effect, if the Partnership Representative is an entity, then the Partnership Representative will appoint a "designated individual" for each taxable year (as described in Proposed Treas. Reg. § 301.6223-1(b)(3)(ii)) (a "*Designated Individual*").  As a condition of an individual's appointment as a Designated Individual, or in connection with the individual ceasing to be the Designated Individual, the Partnership Representative may agree with the Designated Individual that the Partnership Representative may cause the Designated Individual to (i) resign, and (ii) appoint a successor named by the Partnership Representative. Although the Partnership Representative may delegate his, her or its authority and powers to a Designated Individual, each Designated Individual will in all cases act solely at the direction of the Partnership representative.  The Designated Individual will be entitled to the same rights with respect to reimbursement and indemnification as the Partnership Representative.  The provisions contained in this <u>Section 8.5(b)</u> will survive the dissolution of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

8.6     <u>Required Records</u>.  The Manager shall maintain at the Principal Office the information and records that the Members are entitled to obtain from the Company pursuant to the Act. Each Member shall have the absolute right, upon written demand, to examine and copy, in person or by a legal representative, at any reasonable time, and the Company shall make available within ten (10) days after receipt by the Manager of the written demand, all documents referred to in the preceding sentence.

8.7     <u>Reporting</u>.

(a)     The Manager shall be responsible for and shall provide to the Members quarterly and annual reports on the progress of the Property, including leasing updates and customary financial information as well as any other information the Investor Member may require, in its sole discretion.  In addition to the foregoing, Investor Member shall promptly be furnished with any material notices received from or delivered to any lender to the Company or the Property.  The quarterly and annual reports under this <u>Section 8.7(a)</u> (other than those relating to those furnished to or received from lenders, which shall be distributed promptly upon receipt) shall be provided within forty-five (45) days, and ninety (90) days respectively of the expiration of the relevant period.

(a)     The Manager shall ensure that the Company shall prepare and deliver to the Members financial reports (including, without limitation, a profit and loss statement, balance sheet and cash flow report) on an annual and quarterly basis in such form as the Investor Member may so require, in its sole discretion.  The quarterly and annual reports under this <u>Section 8.7(b)</u> shall be provided within forty-five (45) days, and ninety (90) days, respectively, of the expiration of the relevant period.

(b)     within ninety (90) days of the expiration of the relevant period.

(c)     The Manager will establish and maintain a separate bank account in the name of the Company (and no funds other than those of the Company shall be commingled therein) for the Property. The authorized signatories on any bank account of the Company or any Subsidiary shall be as directed by the Investor Member, in its sole discretion. In addition to, and not in lieu of, the foregoing, the Investor Member will promptly be provided by the Manager with such reports as it may reasonably request from time to time.

### Article 9
### Capital

9.1     <u>Initial Capital Contributions</u>. As of the date hereof, the Investor Member has made the Capital Contributions indicated on **Schedule A** (including the deposit contemplated under the Deposit Letter). In exchange for such Capital Contributions, the Investor Member holds, as of the date hereof, 100% of all Membership Interest of the Company.  The Manager holds no equity interest in the Company.  Any deposits furnished under the Deposit Letter are the sole property of the Investor Member and shall be governed the terms of such Deposit Letter.

9.2     <u>No Right to Return of Contribution</u>. No Member shall have the right to the withdrawal or to the return of his, her or its Capital Contribution, except upon the dissolution and liquidation of the Company pursuant to Article 12.

9.3     <u>Additional Capital Contributions</u>.  Neither the Manager nor any Affiliate thereof shall be required to make any Capital Contributions hereunder.  The Investor Member may make additional capital contributions ("*Additional Capital Contributions*") at such times, and in such amounts, as it deems prudent and necessary.

9.4     <u>No Interest on Capital</u>. No interest shall be paid on any Capital Contributions to the Company or on any balance in any Capital Account.

9.5     <u>Reserved</u>.

9.6     <u>Capital Accounts</u>. A separate Capital Account ("*Capital Account*") shall be maintained for each Member in accordance with Code Section 704 and Treasury Regulations Section 1.704-1(b)(2)(iv). The Manager shall increase or decrease the Capital Accounts in accordance with the rules of such regulations including, without limitation, upon the occurrence of any of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f). The Manager's determination of Capital Accounts shall be binding upon all parties.

## Article 10
## Allocation of Profits and Losses

10.1    Capital Account Allocations.

(a)    Except as otherwise provided in this Section 10.1, the Profits or Losses of the Company for each Fiscal Year (or other period) shall be allocated among the Members to the extent necessary to cause the Capital Account balance of each Member with respect to such Fiscal Year (or other period), immediately after making such allocation, as nearly as possible, to equal (i) the distributions that would be made to such Member if, on the last day of such Fiscal Year, the Company were dissolved, its affairs wound up and its assets sold for cash equal to their book values, all Membership liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability), and the remaining assets of the Company were distributed pursuant to Section 12.2(d) to the Members immediately after making such allocation, minus (ii) such Member's share of partnership minimum gain ("*Membership Minimum Gain*") and partner nonrecourse debt minimum gain ("*Member Minimum Gain*"), computed immediately before the hypothetical sale of assets and in accordance with and as defined by Treasury Regulations Section 1.704-2. Unless otherwise provided in this Agreement, every item of income, gain, loss and deduction entering into the computation of Profits or Losses shall be allocated to the Members in the same proportions as the allocation of Profits or Losses for that period. Notwithstanding the foregoing, the Manager may make such allocations as it deems reasonably necessary to give economic effect to the provisions of this Agreement, taking into account such facts and circumstances it deems reasonably necessary for this purpose.

(b)    Notwithstanding Section 10.1(a), the Manager shall not allocate any item of loss or deduction to a Member that would cause or increase a deficit balance in such Member's Capital Account in excess of any limited dollar amount of such deficit balance that such Member is obligated to restore as of the end of any Fiscal Year, taking into account the amounts and adjustments set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4)-(6) and shall make special allocations of the Profits or Losses of the Company among the Members as necessary to cause the allocations under this Section 10.1 to be respected under Code Section 704(b) and Treasury Regulations Section 1.704-1(b)(1). The Manager shall, to the extent possible and in whatever manner it deems appropriate, make subsequent curative allocations of other items of income, gain, loss and deduction to offset any such special tax allocations.

(c)    Member Minimum Gain Chargeback.  Notwithstanding any other provision of Article 10 of the Agreement, if there is a net decrease in Membership Minimum Gain during a Membership taxable year, each Member will be allocated items of income and gain for such year (and, if necessary, for subsequent years) in an amount equal to that Member's share of the net decrease in Membership Minimum Gain during such year (hereinafter referred to as the "Minimum Gain Chargeback Requirement").  A Member's share of the net decrease in Membership Minimum Gain is the amount of the total decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end

32

of the immediately preceding taxable year.  A Member is not subject to the Minimum Gain Chargeback Requirement to the extent:  (i) the Member's share of the net decrease in Membership Minimum Gain is caused by a guarantee, refinancing or other change in the debt instrument causing it to become partially or wholly recourse debt or a Member Nonrecourse Liability, and the Member bears the economic risk of loss for the newly guaranteed, refinanced or otherwise changed liability; (ii) the Member contributes capital to the Company that is used to repay the Nonrecourse Liability and the Member's share of the net decrease in Membership Minimum Gain results from the repayment; or (iii) the Minimum Gain Chargeback Requirement would cause a distortion and the Commissioner of the Internal Revenue Service waives such requirement.

A Member's share of Membership Minimum Gain will be computed in accordance with Treasury Regulation § 1.704-2(g) and as of the end of any Membership taxable year will equal:  (1) the sum of the nonrecourse deductions allocated to that Member up to that time and the distributions made to that Member up to that time of proceeds of a Nonrecourse Liability allocable to an increase of Membership Minimum Gain, minus (2) the sum of that Member's aggregate share of net decrease in Membership Minimum Gain plus his aggregate share of decreases resulting from revaluations of Company Property subject to Nonrecourse Liabilities.  In addition, a Member's share of Membership Minimum Gain will be adjusted for the conversion of recourse and Member Nonrecourse Liabilities into Nonrecourse Liabilities in accordance with Treasury Regulation § 1.704-2(g)(3).  In computing the above, amounts allocated or distributed to the Member's predecessor in interest will be taken into account.

(d)   Minimum Gain Chargeback.   Notwithstanding any other provision of Article 10 of the Agreement, if there is a net decrease in Member Minimum Gain during a Membership taxable year, any Member with a share of that Member Minimum Gain (determined under Treasury Regulation § 1.704-2(i)(5)) as of the beginning of the year will be allocated items of income and gain for such year (and, if necessary, for subsequent years) equal to that Member's share of the net decrease in Member Minimum Gain.  In accordance with Treasury Regulation § 1.704-2(i)(4), a Member is not subject to the Member Minimum Gain Chargeback requirement to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member nonrecourse debt due to a conversion, refinancing or other change in the debt instrument that causes it to be partially or wholly a nonrecourse debt.  The amount that would otherwise be subject to the Member Minimum Gain Chargeback requirement is added to the Member's share of Membership Minimum Gain.

(e)   Qualified Income Offset.   In the event any Member unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation § 1.704.1(b)(2)(ii)(d)(4), (5) or (6), which causes or increases such Member's Capital Account deficit, items of Membership income and gain (consisting of a pro rata portion of each item of Membership income, including gross income, and gain for such year) will be specially allocated to such Member in an amount and manner sufficient to eliminate such Capital Account deficit as quickly as possible, provided that an allocation under this

33

Section 10.1(e) will be made if and only to the extent such Member would have an Adjusted Capital Account Deficit after all other allocations under Article 10 of the Agreement have been made.

(f)  Allocations under this Section 10.1 are intended to meet the alternate test for economic effect under Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and, with respect to any allocations of nonrecourse deductions, are intended to meet the requirements of Treasury Regulations Section 1.704-2I.  A "qualified income offset," a "minimum gain chargeback," each as defined in the Treasury Regulations, and any such other provision that is necessary to cause the allocations under this Section 10.1 to meet such test and requirements are incorporated by reference into this Agreement.

10.2    Tax Allocations. The Manager shall allocate the items of income, gain, loss and deduction of the Company for federal income tax purposes among the Members in the same manner that such items are allocated to the Members' Capital Accounts.

10.3    Tax Credits. All tax credits shall be allocated among the Members in accordance with applicable law.

10.4    Code Section 704(c) Allocations. In accordance with Code Section 704(c), income, gain, loss and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for income tax purposes and its book value for Capital Account purposes, in the same manner as such variations are treated under Code Section 704(c). Any elections or other decisions related to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 10.4 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of income, gain, loss or deduction pursuant to any provision of this Agreement.

10.5    Varying Interests During Fiscal Year. In the event of any changes in Membership Interests during a Fiscal Year, all Profits and Losses from operations of the Company during such Fiscal Year, using such methods of accounting for depreciation and other items as the Manager determines to use for federal income tax purposes, shall be allocated to each Member based on its varying interest in the Company during such operating year in accordance with Code Section 706. The Manager shall determine in accordance with Code Section 706 whether to prorate items of income and deduction according to the portion of the Fiscal Year for which a Member held Membership Interests or whether to close the books on an interim basis and divide such operating year into two or more segments.

10.6    Tax Withholding.  Notwithstanding any other provision of this Agreement, the Manager, with the written approval of the Investor Member, in its sole but reasonable discretion, is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any withholding, estimated tax or similar requirements established under any federal, state or local tax law, including, without limitation, withholding on any distribution to any Member and/or requiring that a Member pay to the Company any amount required by the

Company to pay over to a governmental authority as a withholding, estimated tax or similar payment on behalf of such Member. For all purposes of this Article 10, any amount withheld on any distribution and paid over to the appropriate governmental body will be treated as if such amount had in fact been distributed to the Member. Each Member agrees to execute such consents and elections as may be required by the taxing authority of any state or local government in which the Company does business and generates taxable income so that the Company will not be required to withhold on the taxable income of the Company allocated to such Member for such state or locality.

## Article 11
## Distributions

11.1    Distributions. At such times as the Investor Member determines (other than Net Cash Flow from a Capital Event which, unless otherwise expressly provided for herein must be distributed to the Members no later than five (5) days after the Company's receipt thereof) but no less frequently than quarterly, the Company shall distribute Available Net Cash Flow and Net Cash Flow from a Capital Event as follows:

(a)    First, 100% to the Investor Member, until such time as Investor Member has received an eight percent (8.0%) IRR (inclusive of a return of Capital Contributions); then

(b)    Thereafter, (i) 25% to the Manager; and (ii) 75% to the Investor Member;

(c)    It is understood and agreed that any removal of the Manager on account of Cause shall result in the distributions payable to the Manager pursuant to Section 11.1(b) above to immediately cease to be payable to the Manager and all distributions hereunder shall thereafter be made solely to the Investor Member.

(d)    The Company will cause any Subsidiary of the Company which may own the Property to distribute all cash to the Company as soon as practicable such that the Company may make the distributions to the Members as contemplated hereby.

11.2    Limitations on Distributions. Notwithstanding any provision to the contrary in this Article 11:

(a)    All distributions made in connection with the liquidation and winding up of the Company shall be made in the manner provided in Section 12.2.

(b)    No distribution shall be made that would result in a violation of Section 17-607 of the Act.

#26329v10

## Article 12
## Dissolution and Liquidation

12.1    Events Causing Dissolution.  The Company shall be dissolved upon the first of any of the following events to occur:

(a)    The sale of all or substantially all of the Company's and its Subsidiaries assets in accordance with the terms hereof;

(b)    The determination by the Investor Member, subject to Manager's reasonable approval; or

(c)    The final decree of a court that dissolution is required under applicable law.

12.2    Liquidation and Winding Up. If the Company is dissolved pursuant to Section 12.1, the Company shall be liquidated and the Manager (or other Person or Persons designated by the Investor Member or by a decree of court) shall wind up the affairs of the Company. The Manager or other Persons winding up the affairs of the Company shall promptly proceed to the liquidation of the Company and, in settling the accounts of the Company, the assets and the property of the Company shall be distributed in the following order of priority:

(a)    To the payment of all debts and liabilities of the Company in the order of priority as provided by law (other than outstanding loans from a Member);

(b)    To the establishment of any reserves deemed necessary by the Investor Member or the Person winding up the affairs of the Company for any contingent liabilities or obligations of the Company; and

(c)    The balance, if any, in accordance with Section 11.1.

12.3    No Deficit Restoration Obligation. If any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all fiscal periods including the fiscal period during which the liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any Person for any purpose whatsoever.

## Article 13
## Amendment

Unless otherwise allowed under this Agreement, the Certificate of Formation and this Agreement may be amended by an instrument in writing signed by the Investor Member or, with the approval or upon the direction of the Investor Member, the Manager, in each case, subject to the Manager Protections. Notwithstanding the foregoing, the Manager shall amend **Schedule A**, without having to obtain the consent of any Member, as appropriate to reflect accurately any valid transfers of Membership Interests, issuances of new Membership Interests and admissions of new

36

Members that are affected in accordance with this Agreement and with the approval of the Investor Member.  The Manager shall promptly deliver a copy of any such amendment to each Member, underline(provided that), a failure of the Manager to deliver a copy of any amendment to the Members shall not invalidate such amendment. Notwithstanding the foregoing, no amendment of this Agreement shall be made which actually and disproportionately reduces the distributions to be paid to the Manager hereby or otherwise violates the Manager Protections without the written consent of the Manager.

### Article 14
### Approval of Reorganizations and Bankruptcy

Without the consent of the Investor Member, the Company shall not engage in any Reorganization or commence any proceedings, or the filing of any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency or similar law.

### Article 15
### Representations, Warranties of the Members

Representations and Warranties of the Members and the Manager. Each of the Members and the Manager (to the extent applicable) represents and warrants to each of the other Members and the Company and the as follows:

(a)  Any Membership Interests being acquired by such Member are being purchased for such Member's own account and not with a view to, or for sale in connection with, any distribution or public offering thereof within the meaning of the Securities Act of 1933, as amended (the "*Securities Act*"). Such Member understands that such Membership Interests have not been registered under the Securities Act or any state securities laws by reason of their contemplated issuance in transactions exempt from the registration and prospectus delivery requirements thereof and that the reliance of the Company and others upon such exemptions is predicated in part by the representations and warranties of such Member contained in this Agreement.

(b)  Such Person has the requisite power and authority (whether corporate or otherwise) and legal capacity to enter into, and to carry out its obligations under this Agreement.

(c)  The execution and delivery by such Person of this Agreement and the consummation by such Person of the transactions contemplated by this Agreement have been duly authorized before the Effective Date by all necessary action on the part of such Person.

(d)  This Agreement has been duly executed and delivered by such Person and constitutes a valid and binding obligation enforceable against such Person in accordance with its terms.

(e)      Such Person is not subject to, or obligated under, any provision of: (i) any agreement, arrangement or understanding; (ii) any license, franchise or permit; or (iii) any law, regulation, order, judgment or decree that would be breached or violated, or in respect of which a right of termination or acceleration or any encumbrance on any of such Person's assets would be created, by such Person's execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, except for such agreements as to which such Person  has previously obtained the consent of the other party or parties thereto.

(f)      No authorization, consent or approval of, waiver or exemption by, or filing or registration with, any public body, court, third-party or authority is necessary on such Person's part, which has not previously been obtained by such Person for the consummation of the transactions contemplated by this Agreement.

(g)      No Person has or will have, as a result of any act or omission by such Person any right, interest or valid claim against the Company or any other Person for any commission, fee or other compensation as a finder or broker, or in any similar capacity, in connection with the transactions contemplated by this Agreement.

(h)      such Person is not a "foreign person" within the meaning of the Code, and the transaction contemplated hereby does not constitute a disposition of a U.S. real property interest by a foreign person.

(i)      such Person is in compliance in all material respects with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (September 23, 2001) (the "*Order*") and other similar requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("*OFAC*") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "*Orders*") and such Person is not : (a) listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "*Lists*"); (b)  a Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or (c) owned or controlled by, or acts for or on behalf of, any person on the Lists or any other person who has been determined by competent authority to be subject to the prohibitions contained in the Orders. The terms "Governmental Authority" and "Governmental Authorities" mean the United States of America, the State, the county, and city where the Property is located, and any other political subdivision in which the Property is located or that exercises jurisdiction over the Property, and any agency, department, commission, board, bureau, property owners' association, utility district, flood control district, improvement district, or similar district, or other instrumentality of any of them.

**Article 16**
**Miscellaneous Provisions**

16.1    <u>Entire Agreement</u>. This Agreement (including the exhibits, schedules, and other documents referred to in this Agreement) contains the entire understanding between the Parties with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements, or representations, written or oral, relating to the subject matter of this Agreement.

16.2    <u>No Liability</u>. Unless otherwise provided in this Agreement, no Member will be liable to any other Member or to the Company for any good faith act or omission to act in the exercise of his or her judgment under the provisions of this Agreement.

16.3    <u>Time of Essence</u>. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

16.4    <u>Signatures; Counterparts</u>. This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument. The parties may exchange signatures by facsimile or electronic transmission and the same shall constitute delivery of this Agreement with respect to the delivering party.

16.5    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law but if any provision of this Agreement is held to be invalid, illegal or unenforceable under any applicable law or rule, the validity, legality and enforceability of the other provisions of this Agreement will not be affected or impaired thereby.

16.6    <u>Successors and Assigns</u>. This Agreement shall be binding upon the transferees, successors, assigns and legal representatives of the parties to this Agreement.

16.7    <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i) when delivered if personally delivered by hand (with written confirmation of receipt); (ii) when received if sent by a nationally recognized overnight courier service (receipt requested); (iii) five (5) Business Days after being mailed, if sent by first class mail, return receipt requested; or (iv) when receipt is acknowledged by an affirmative act of the party receiving notice, if sent by facsimile, telecopy or other electronic transmission device (provided that such an acknowledgement does not include an acknowledgment generated automatically by a facsimile or telecopy machine or other electronic transmission device). All notices to the Company shall be addressed to its Principal Office. All notices to a Member shall be addressed to such Member's address set forth in the records of the Company or to such other address as has been designated by such Member to the Company.  Notwithstanding the foregoing, all notices and materials delivered to Investor Member must be sent by electronic mail.

16.8     Headings. The headings and any table of contents contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

16.9     References. References to Sections, Exhibits, Schedules and the references are to Sections, Exhibits, Schedules and the like of this Agreement unless otherwise expressly provided.

16.10   Construction. The word "including" means "including without limitation." The use of the masculine, feminine or neuter gender or the singular or plural form of words will not limit any provisions of this Agreement.

16.11   Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)     Governing Law. All matters relating to the interpretation, construction, validity and enforcement of this Agreement shall be governed by the laws of the State of Delaware, without giving effect to any choice of law provisions thereof. Any conflict or apparent conflict between this Agreement and the Act will be resolved in favor of this Agreement, expect as otherwise specifically required by the Act.

(b)     Jurisdiction; Choice of Forum.  Each Party hereby irrevocably (a) submits to the exclusive jurisdiction of local, state or federal court sitting in New York County, New York, in any action or proceeding arising out of or relating to this Agreement, the relations between the Parties and any matter, action or transaction described in this Agreement, (b) agrees that any such courts shall have exclusive jurisdiction over such actions or proceedings, (c) waives the defense of inconvenient forum to the maintenance and continuation of such action or proceeding, (d) consents to the service of any and all process in any such action or proceeding by the mailing of copies (certified mail, return receipt requested and postage prepaid) of such process to them at their addresses specified in herein and (e) agrees that a final and non- appealable judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)     WAIVER OF JURY TRIAL. EACH MEMBER AND THE MANAGER FOR ITSELF AND ON BEHALF OF ITS AFFILIATES, HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION, LAWSUIT OR PROCEEDING RELATING TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DESCRIBED IN THIS AGREEMENT OR DISPUTE BETWEEN THE PARTIES (INCLUDING DISPUTES WHICH ALSO INVOLVE OTHER PERSONS).

16.12   Third-Party Benefit. Nothing in this Agreement, express or implied, is intended to confer upon any Person not a party to this Agreement any rights, remedies, obligations or liabilities of any nature whatsoever.

16.13   <u>Good Faith and Fair Dealing</u>. The Members shall conduct the business and affairs of the Company in accordance with such standards as are set forth herein and in accordance with this Agreement and the implied contractual obligation of good faith and fair dealing. The provisions of this Agreement replace, eliminate, and otherwise supplant those duties (including fiduciary duties) and liabilities that the Members might otherwise have with respect to each other at law or under this Agreement. Notwithstanding any other provision of this Agreement or otherwise applicable provision of law, whenever a Member is permitted or required by this Agreement to make a decision in its "sole discretion" or "discretion," such Member is permitted to consider only those interests and factors that such Member desires (including the Member's own interests, interests of affiliates (expressly including any affiliate which is a lender to or a Manager of the Company), and interests and factors that are unrelated to the Company), and to the fullest extent permitted by applicable law, is under no duty or obligation to give any consideration to any other interests of, or factors affecting, the Company, the other Members or any other Person.

16.14   <u>Additional Actions and Documents</u>. The parties agree to execute and deliver any further instruments or perform any acts that are or may become necessary to carry on the Company created by this Agreement or to effectuate its purposes.

16.15   <u>Specific Performance</u>. Each of the Parties acknowledges and agrees that the subject matter of this Agreement is unique, that the other parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached, and that the remedies at law would not be adequate to compensate such other parties not in default or in breach. Accordingly, each of the parties agrees that the other parties will be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions of this Agreement in addition to any other remedy to which they may be entitled, at law or in equity. The parties waive any defense that a remedy at law is adequate and any requirement to post bond or provide similar security in connection with actions instituted for injunctive relief or specific performance of this Agreement.

16.16   <u>Waiver of Partition</u>. Each Member irrevocably waives any and all rights that he, she, or it may have to maintain an action for partition of any of the Company's property.

16.17   <u>Waiver of Conflicts of Interest.</u>

16.18   The initial attorneys for the Company shall be Wachtel Missry LLP ("<u>Wachtel</u>"); <u>provided</u>, <u>however</u>, that any changes to the attorneys for the Company shall require the consent of the Investor Member.  The Company specifically acknowledges and agrees that Wachtel shall be permitted to render legal advice and to provide legal services to the Company from time to time, and each Member and the Manager  covenants and agrees that such representation of the Company by Wachtel shall not alone (i) result in the existence of an attorney/client relationship between Wachtel, on the one hand, and TCC (and/or its Affiliates), on the other hand; and/or (ii) disqualify Wachtel from providing legal advice and legal services at any time in the future. The Members and TCC acknowledge and agree that Wachtel has represented the Investor Member in connection with this Agreement and all other agreements contemplated by this Agreement and/or pertaining to the Company and its business.  From time to time, and at the request of  the Investor Member (and/or

its Affiliates), Wachtel may render legal advice and provide legal services to the Investor Member (and/or its Affiliates) with respect to the Company and/or the business of the Company (including the Property) and related matters at fees and costs to be paid by the Investor Member (and/or its Affiliates) or the Company as herein provided.  In no event shall an attorney/client relationship exist between Wachtel on the one hand, and TCC (or its Affiliates), on the other hand, with respect to the Company and/or the business of the Company (including the Property) and related matters as a result of any such representation.  Except as set forth in this Agreement, the Company shall not be obligated to pay any fees, costs and expenses as a result of such representation.

## Article 17
## Special Purpose Entity

17.1   <u>Special Purpose Covenants</u>.

Reference is made to that certain mortgage financing received by the Company from STONETOWN RANGEVIEW, LLC on or about the date hereof (the "Loan").  Until such time a such Loan is paid in full, the Company shall:

(a)     Maintain its assets, accounts or subaccounts, books, records, financial statements, stationery, invoices, and checks separate from and not commingled with any of those of any other person or entity;

(b)     Conduct its own business in its own name, pay its own liabilities out of its own funds, allocate fairly and reasonably any overhead for shared employees and office space, and to maintain an arm's length relationship with its affiliates;

(c)     Hold itself out as a separate entity, correct any known misunderstanding regarding its separate identity, maintain adequate capital in light of its contemplated business operations (provided the foregoing shall not be deemed to require any capital contributions to be made by any owner of Trustor), and observe all organizational formalities;

(d)     Not guarantee or become obligated for the debts of any other entity or person or hold out its credit or assets as being available to satisfy the obligations of others, including not acquiring obligations or securities of its partners, members or shareholders, except in connection with the Loan;

(e)     Not pledge its assets for the benefit of any other entity or person or make any loans or advances to any person or entity, except in connection with the Loan;

(f)     Not enter into any contract or agreement with any affiliate, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any affiliate;

(g)     Not seek the dissolution or winding up, in whole or in part, of Trustor, nor merge with or be consolidated into any other entity; and

42

(h)    Maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate, guarantor or any other person or entity.

**[SIGNATURES FOLLOW ON NEXT PAGE]**

43

**INVESTOR MEMBER**

ANCHORAGE INVESTMENT PARTNERS LLC,
a Delaware limited liability company

By: _____
Name: Robert Frucht
Title: _____Authorized Signatory_____


WITH RESPECT TO SECTION 5.13 ONLY:


MAPLEWOOD PARTNERSHIP INTERESTS
LLC

By: _____
Name: Robert Frucht
Title: Authorized Signatory

2

#26329v10

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the Effective Date.

**Manager**

**TCC Asset Management II LLC**,
a Delaware limited liability company
Its: Manager

By: _Jay Yang_ _____
Name: _____
Title: _____

WITH RESPECT TO SECTION 5.11 ONLY:

**THE CHURCHLIGHT COMMUNITIES LLC**

By: _Jay Yang_ _____
Name: Jay Yang
Title: Authorized Signatory

#26329v10

---

<u>SCHEDULE A</u>

| <u>Members</u> | <u>Membership Interests</u> | <u>Capital Contribution</u> |
|---|---|---|
| ANCHORAGE INVESTMENT PARTNERS | 100% | $6,260,000 |
| TCC Asset Management II LLC  (**Manager**) | **0%** | **Zero** |
| **TOTALS** | **100%** | **$6,260,000** |

70965793.6

#26329v10